IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| MICHAEL WAYNE BECKNER, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 7:13cv00530 |
| ) | |
| v. ) | |
| ) | By: Michael F. Urbanski |
| TREAD CORPORATION, ) | United States District Judge |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff Michael Wayne Beckner brings this action against defendant Tread Corporation pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"). Beckner applied for a welding position with Tread and claims Tread regarded him as having a disability as defined in the ADA and failed to hire him as a result. Tread moves for summary judgment (Dkt. # 17), arguing Beckner cannot establish a prima facie case of discrimination in violation of the ADA. The court agrees and, for the reasons set forth herein, will **GRANT** Tread's motion.

### I.

Tread is in the business of creating customized vehicles and storage equipment for the safe handling and transport of explosives. Harrison Decl., Dkt. # 18-8, at ¶ 7; White Decl., Dkt. # 18-9, at ¶ 5; see also Def.'s Answers to Interrog., Dkt. # 18-7, at # 6. Welders at Tread "perform all the welding needed to create this customized equipment, which includes welding custom truck bodies, storage bins, and the smaller parts that are affixed to the truck bodies and storage bins." Harrison Decl., Dkt. # 18-8, at ¶ 8; see also White Decl., Dkt. # 18-9, at ¶ 5. The welding shop at Tread is broken into various bays based on the product being welded, and "[a]ll welders at Tread are expected to be able to work in any of these bays at any time." Def.'s Answers to Interrog., Dkt. # 18-7, at # 6.

Beckner, a welder by trade, applied for employment with Tread in February 2011. Beckner Dep., Dkt. # 24-7, at 33-34. In connection with that employment application, Beckner participated in several interviews, id. at 38, and successfully completed a welding test, id. at 39. Tread expressed an interest in hiring Beckner as a second shift welder and referred him to Bright Services, a temporary staffing agency. Sink Dep., Dkt. # 24-11, at 9; see also Kish Dep., Dkt. # 30, at Ex. 26. In order to become eligible for full-time employment with Tread, Beckner would have to complete Bright Services' application process and successfully complete a 90-day introductory period at Tread as a temporary employee through Bright Services. Kish Dep., Dkt. # 30, at 8; see also Def.'s Answers to Interrog., Dkt. # 18-7, at # 2, 3.

In connection with Bright Services' application process, Beckner filled out a paper application, completed an interview and was referred to Valley Occupational Medicine for a physical examination and drug screening. Sink Dep., Dkt. # 18-3, at 9, 14. In the course of his physical examination, Beckner indicated on a medical history form that he takes gabapentin, the generic form of Neurontin, which treats neurological pain. Castern Dep., Dkt. # 29, at 11-12, at VOM17. This prompted examining physician Louis Castern, M.D., to inquire further with Beckner. Dr. Castern's notes from March 17, 2011 state: "No back injuries or disorders. Sprain – neck – 2 years ago→ Bilat[eral] forearm." Castern Dep., Dkt. # 29, at VOM15. Dr. Castern noted Beckner reported sensitivity that increased with hot water as a result of this injury, but no pain or limitations. Id. Dr. Castern requested medical records related to this condition, a practice he described as "pretty routine [ ] when we do find something of that nature." Castern Dep., Dkt. # 29, at 11.

These medical records revealed that on August 1, 2010, Beckner presented to the emergency room after suffering a fall while intoxicated the previous night that left him unable to move his arms or hands. Ex. F to Def.'s Summ J. Br., Dkt. # 42, at 55. Beckner was admitted to the hospital after he exhibited central cord syndrome upon evaluation. Id. A CT scan and MRI of his neck revealed

2

"severe cervical stenosis, likely congenital, with a blocked vertebra at C2-3. There was evidence for cord swelling." Id. Although he demonstrated "dramatic improvement in his arm and hand function," "he clearly was not normal at the time of discharge" two days later. Id. Treating neurosurgeon, Dr. John Feldenzer, noted Beckner would need a "decompressive procedure sometime in the future," but recommended he wait at least six to eight weeks to allow for optimal cord recovery and decrease in swelling. Id.

Beckner followed up with Dr. Feldenzer on August 16, 2010. Records reveal Beckner's pain and dysesthesias were improving, his strength and sensation were returning to his arms and hands, and he appeared "certainly better than when he was in the hospital." Id. at 53. Dr. Feldenzer noted again that Beckner would "need a cervical decompression through laminectomy." Id. On September 8, 2010, Dr. Feldenzer noted marked improvement in Beckner's condition: "He is now able to wear shirts with sleeves having no dysesthesias in his arms. Strength has returned to his hands. There is no numbness in his hands." Id. at 52. Dr. Feldenzer removed Beckner's cervical collar and noted:

> He may return to normal activities and may start the job that has been held for him as a welder. I have placed no restrictions on him. He was advised of course not to drink alcohol and put him in a situation where he could fall and injure himself again. He understands that he has an underlying problem with cervical stenosis and will need a decompressive multilevel cervical laminectomy.

Id. The last treatment note from Dr. Feldenzer dated October 28, 2010 states:

> I last saw [Beckner] 7 weeks ago. He missed a visit in mid-October. He is back to work as a welder. He reports that his forearms ache especially in the morning and he notices intermittent tingling in his hands. Both hands are affected. The finger tips tingle fairly constantly. He notices that with neck extension there is some tingling in his arms and chest.

Id. at 51. Dr. Feldenzer observed upon examination that the range of motion in Beckner's neck was limited in extension, less so in flexion, "but both cause paresthesias at extremes of motion." Id.

3

Although Beckner "continue[d] to do well," he was noted to "still hav[e] some symptoms of spinal cord irritation." Id. Dr. Feldenzer "again urged him to consider moving ahead now with operative decompression via a C3 through C7 laminectomy," and "recommended that he remain on the Neurontin in the meantime." Id. Dr. Feldenzer "urged him to be careful with his neck and to avoid extended extension positions and any chance of falling." Id. A work note signed by Dr. Feldenzer dated October 28, 2010 says "10/29/10 may return to work with no restrictions." Beckner Dep., Dkt. # 30, at Ex. 2.

Based on these records, Dr. Castern advised Beckner that he "would need a recent evaluation and release by Dr. Feldenzer with any current restrictions indicated," before clearing Beckner for the work as a welder at Tread. Castern Dep., Dkt. # 29, at 12, VOM14. On March 25, 2011, Linda Trent from Dr. Feldenzer's office sent Valley Occupational Medicine a fax transmission concerning Beckner, which stated:

> Patient informs our office that you have told him that Dr. Feldenzer placed work restrictions. That is NOT TRUE – see attached work note given to patient when last seen on 10/28/10. The last paragraph in Dr. Feldenzer's office note of 10/28/10 – Dr. Feldenzer gave a caution and recommendation to Mr. Beckner – NOT a restrictions [sic].

Beckner Dep., Dkt. # 30, at Ex. 10. A handwritten note from Dr. Castern dated March 25, 2011 states: "Note from Dr. Feldenzer no restrictions other than note at last visit to avoid prolonged extension of neck or possibility of falling." Castern Dep., Dkt. # 29, at VOM14. On Beckner's form, Dr. Castern classified Beckner under category "B" – "Medically Acceptable with Job Assignment Limitations: Must avoid prolonged extension of neck (looking upward) or probabily [sic] of falling." Id.[1]

---

[1] Category "C" – "Temporarily Deferred" pending correction of medical problem, is also circled on this form. Castern Dep., Dkt. # 29, at VOM 14. Dr. Castern testified he first circled category C when he "determined that [he] would need additional information before [he] could approve [Beckner]," and then circled category "B" after receiving correspondence from Dr. Feldenzer's office. Id. at 27, 38.

4

Dr. Castern explained in his deposition his reason for imposing these limitations: "[T]he recommendation was made at the last visit that [Beckner] had with Dr. Feldenzer, surgery was being strongly recommended, and he remained on the medication that was specifically treating the condition that he was supposed[ ] to have corrected." Id. at 21. Dr. Castern indicated that he did not consider the March 25, 2011 fax from Dr. Feldenzer's office to be "a removal of the restrictions or conditions that [he] had observed in Dr. Feldenzer's or Roanoke Neurosurgey's notes concerning Mr. Beckner." Castern Dep., Dkt. # 29, at 17. As to Beckner's ability to work as a welder at Tread, Dr. Castern testified: "Well, I do know that they do, some of the employees at least, do overhead work and overhead welding. And that's what concerned me and felt that he did need accommodations assigned from what Dr. – or based on Dr. Feldenzer's recommendations." Id. at 18; see also Sink Dep., Dkt. # 18-3, at 16-17 (stating Dr. Castern discussed the job requirements with Brian Kish); Ex. 20 to Bright Dep., Dkt. # 18-6. Dr. Castern made clear in his testimony that he did approve Beckner for work in an industrial setting so long as it did not involve prolonged overhead work. Castern Dep., Dkt. # 29, at 19-20.

On April 1, 2011, Tread's Human Resources Director Brian Kish sent an email to Kenneth White, Vice President of Manufacturing, on which he copied Tread's CEO Bill McClane, stating:

> Good Morning Kenny,
>
> Mike Bendrick [sic] is a welder who did well on his weld tests and in interviews with Dave H. and Bill. Mike has recently worked for KME Fire Apparatus, Apex Industrial, and General Truck and we are looking at offering Mike an opportunity.
>
> Valley Occupational did a thorough physical of Mike and noted that Mike had a previous neck injury and has since returned to working as a welder. According to the medical records sent to Dr. Castern at Valley Occupational, Mike's treating physician recommended a procedure/operation, however cleared him to return to work as a welder with two noted conditions.
>
>     1.) Avoid overhead work/welding
>     2.) Minimize fall hazard potential

5

> I spoke with David[2] and he mentioned that our welding equipment limited the ability to do overhead welding as it needs to be operated close to horizontal. He also mentioned that fall hazards are minimized due to safety protection (Tie Offs, Handrails, etc.).
>
> Do you agree with Dave's assessment and if not do you see Mike as being a Welder B (Working in the smaller parts areas and not the Body Bays)[3]
>
> Thanks,
>
> Brian

Kish Dep., Dkt. # 30, at Ex. 25. In a reply email also dated April 1, 2011, Kenneth White responded: "I agree with Dave's assessment, but am concerned with any future exposure/risk to injuries. Bottom line is I guess, if the doctor clears him for work he is 'good to go.'" Id.

Kish testified at his deposition that this email exchange "generated more conversation and discussion" amongst the decision-makers at Tread concerning Beckner. Id. at 39; see also id. at 35, 38, 45. Ultimately, the group came to a consensus and determined not to hire Beckner,[4] id. at 10-11, out of concern for Beckner's and other employees' safety because the welder job at issue required

---

[2] The "David" mentioned in this email refers to one of two supervisors named David. Kish Dep., Dkt. # 30, at 34. Brian Kish testified that it likely refers to David Harrison. Id. at 35.

[3] With respect to this Welder B reference, Brian Kish testified in his deposition that while there was a "Welder B" position when Kish first started working at Tread, "that changed over time and there was only one classification of welders" at the time Beckner applied for work with Tread, a fact Kish learned in conversations that followed this email. Kish Dep., Dkt. # 30, at 31-32. Kish explained:

> There was a push towards having people who could cross-train and move throughout the factory. And my recollection in response to the e-mail that I wrote was that the operations team was—my recollection was that they were saying that that really wasn't—we really didn't have that position anymore, we were really only going after people who could cross-train. And by the time I left Tread, we did not make any distinction between—we just had welders, no classifications.

Id. at 54-55.

[4] Beckner testified in his deposition that he "didn't get hired" by Tread. Beckner Dep., Dkt. # 18-1, at 67. In his complaint, however, he alleges two theories: failure to hire and wrongful termination. Compl., Dkt. # 1. This latter allegation likely stems from Beckner's assertion that at some point Tread told him, "welcome aboard." Beckner Dep., Dkt. # 24-7, at 113, 118. Either way, the analysis is the same.

6

prolonged periods of looking up, id. at 53. See also Sink Dep., Dkt. # 18-3, at 17 (stating Kish told her Beckner did not meet the requirements for the welder position, specifically because Beckner "could not look up for an extended period of time."). This lawsuit followed.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly-Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. June 25, 2014) (citing Tolan v. Cotton, 134 S.

7

Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the Court must determine that no reasonable jury could find for the non[-]moving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

## III.

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Where, as here, the defendant disavows reliance on discriminatory reasons for its adverse employment action, plaintiff's claims are adjudicated under the familiar burden-shifting framework set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). See Ennis v. Nat'l Ass'n of Business & Educ. Radio, Inc., 53 F.3d 55, 57 (4th Cir. 1995) (applying McDonnell-Douglas framework to ADA case). Under this framework, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. McDonnell-Douglas, 411 U.S. at 802. The burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. Id. If the defendant meets this burden, the plaintiff must then prove by a

8

preponderance of the evidence that the reason given by defendant is a pretext for discrimination. Id. at 804.

To meet his burden of establishing a prima facie case of discrimination under the ADA, Beckner must demonstrate: (1) that he had a disability as defined in the ADA; (2) that he was a "qualified individual" which entails being able to perform the essential functions of his job; and (3) that Tread took an adverse employment action against him on account of his disability. Young v. United Parcel Service, 707 F.3d 437, 443 (4th Cir. 2013), cert. granted, 134 S. Ct. 2898 (2014).

A person has a disability under the ADA if he (a) has a physical or mental impairment that substantially limits one or more major life activities; (b) has a record of such impairment; or (c) is regarded as having such an impairment. 42 U.S.C. § 12102(1). In this case, Beckner argues that he meets the ADA's definition of disability because he was regarded as having a disability by Tread. See Compl., Dkt. # 1, at ¶¶ 25, 34; Def.'s Summ. J. Br., Dkt. # 18, at Ex. M ¶ 6; Pl.'s Br., Dkt. # 24, at 7. An individual meets the "regarded as" definition of disability if he establishes that he suffered an adverse employment action "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). However, this definition does not apply to impairments that are "transitory or minor," meaning they have an "actual or expected duration of 6 months or less." Id. at § 12102(3)(B).

The court will assume, without deciding, for purposes of this analysis that Beckner can clear this first hurdle and carry his burden of establishing he had a disability as defined in the ADA. Indeed, the thrust of this case is at the second step—whether Beckner can establish that he was able to perform the essential functions of the welding job. Because Beckner cannot meet his burden of proving he was a "qualified individual" under the ADA, Tread is entitled to summary judgment. See

9

Rohan v. Networks Presentations, LLC, 375 F.3d 266, 272 (4th Cir. 2004) ("[T]o survive summary judgment, [plaintiff] had to produce evidence that []he is both qualified and disabled.").

IV.

The ADA defines a "qualified individual" as someone who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."[5] 42 U.S.C. § 12111(8). Essential job functions include "the fundamental job duties of the employment position the individual with a disability holds or desires," 29 C.F.R. § 1630.2(n)(2), that "'bear[] more than a marginal relationship to the job at issue,'" Rohan, 375 F.3d at 279 (quoting Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 213 (4th Cir. 1994)). A job function may be considered essential because the reason the position exists is to perform that function, or because "[t]he function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 C.F.R. § 1630.2(n)(2). In determining whether someone is a "qualified individual," "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); see also 29 C.F.R § 1630.2(n)(3).

As evidence of the essential functions of the welding job, Tread submits declarations from Kenneth White, its Vice President of Manufacturing during the relevant period, and Dave Harrison, Second Shift Supervisor of welding operations at Tread. In his declaration, Kenneth White states that "[d]uring the period of February to March 2011, Tread was working on a large contract for a company located in Latin America," and, as a result, "was looking to employ welders who could perform body welding," which "requires the welder to climb and weld out-of-position." White

---

[5] In a "regarded as" case such as this one, no accommodations are required. 42 U.S.C. § 12201(h); see Williams v. Baltimore City Cmty. Coll., No. GLR-12-238, 2014 WL 4784320, at *5 n.5 (D. Md. Sept. 23, 2014).

10

Decl., Dkt. # 18-9, at ¶¶ 6, 7. To do so, the welder must "work safely off the ground, which includes working on ladders, platforms, or on top of truck bodies." Id. at ¶ 8. Dave Harrison stated that while Tread "attempts to minimize risks associated with working off the ground by using harnesses and having some step stools with handrails," the risk is not eliminated entirely. Harrison Decl., Dkt. # 18-8, at ¶ 10.

Additionally, the welder must also "be able to weld overhead and at odd angles or in cramped spaces such as inside or on top of truck bodies, tanks and bins." White Decl., Dkt. # 18-8, at ¶ 8. Although "Tread attempts to position equipment so that welding can be performed at horizontal," it is not always possible because of the nature of the customized equipment manufactured by Tread. Harrison Decl., Dkt. # 18-8, at ¶ 11. And because the welding shop uses an overhead crane and suspension system to suspend, rotate, and transport parts throughout the shop, welders must "be able to look overhead frequently to monitor the movement of the cranes and the suspension of parts off the ground." Id. at ¶ 12; see White Decl., Dkt. # 18-9, at ¶ 9. The ability to monitor the overhead crane system, weld overhead and work off the ground are essential functions of being a welder at Tread, according to both White and Harrison. Harrison Decl., Dkt. #18-8, at ¶ 13; White Decl., Dkt. # 18-9, at ¶ 10.

Taking into account these requirements, Tread determined that the restrictions placed on Beckner by Dr. Feldenzer, incorporated into Dr. Castern's classification of Beckner as "Medically Acceptable with Job Assignment Limitations," Castern Dep., Dkt. # 29, at VOM14, rendered Beckner unable to perform the essential functions of job. Kish Dep., Dkt. # 30, at 9-10, 53. For his part, Beckner offers no evidence to suggest that he could perform the essential functions of the welder position aside from his own self-serving testimony:

> Q. Okay. And you feel like you have an understanding of what the job requirements were?
>
> A. I sure do.

11

Q. Okay. And how did you get that understanding?

A. Just by walking around, talking to the supervisor, night shift supervisor, and Brian Kish. They showed me the whole plant.

Q. Now, you would have to, at least at some times, in the Tread workplace be on ladders as a welder, correct?

A. Correct.

Q. And you would sometimes, as a welder at Tread, have to do work that was overhead?

A. Correct.

Q. That's your contention that you would have been able to do that?

A. I do it now.

Beckner Dep., Dkt. # 18-1, at 96.

Beckner focuses his summary judgment argument on the April 1, 2011 email exchange between Human Resources Director Brian Kish, Vice President Kenneth White and CEO Bill McClane, which he describes as his "strongest piece of evidence in this case." Pl.'s Br., Dkt. # 24, at 14. Beckner contends this email exchange "clearly indicates that Mr. Beckner passed his physical examination with the noted restrictions," and that from it, "a fact finder could determine that there exists no legitimate business need for Mr. Beckner to have been required to stretch his neck as a welder or perform work over his head." Id. at 15. The court cannot agree.

To be sure, the April 1st email from Brian Kish indicates that shift supervisor David Harrison told him that Tread's "welding equipment limited the ability to do overhead welding as it needs to be operated close to horizontal," and "that fall hazards are minimized due to safety protection (Tie Offs, Handrails, etc.)." Kish Dep., Dkt. # 30, at Ex. 25. Contrary to Beckner's argument, however, this email cannot be read to mean that Beckner would *never* be required to stretch his neck or work overhead. Even Beckner himself recognized by simply walking around

12

Tread that welders are sometimes required to work overhead. Beckner Dep., Dkt. # 18-1, at 96. In his deposition, Brian Kish elaborated on these requirements:

> A. My understanding is a tie-off is something that if someone were to fall, it's like a harness. As one example.
>
> Q. The harness that keeps the welder from falling, correct?
>
> A. From falling a long distance. I mean, they still fall. There's still slack in the line.
>
> Q. Next to that it says handrails. I'm assuming that there would be handrails around where these welders were working?
>
> A. In some cases, yes. In some cases, no. . . .

Kish Dep., Dkt. # 30, at 44. Kenneth White stated in his April 1st reply email that he agreed with David Harrison's assessment that the welding job at issue involves "limited" overhead welding and the fall hazards are "minimized." Nevertheless, White was "concerned with any future exposure/risk to injuries." Id. at Ex. 25.[6] Brian Kish testified that this email exchange generated additional discussion about the essential functions of the job and whether Beckner would be able to perform them given the limitations imposed by Dr. Castern and Dr. Feldenzer. Id. at 35, 38, 39, 45. Because there was a concern "for Mr. Beckner and other employees' safety," given the nature of the welding job and Beckner's physician-imposed limitations, id. at 53, Tread determined that Beckner did not meet the requirements for employment. Sink Dep., Dkt. # 18-3, at 17.

Aside from Beckner's own testimony that he could perform work as a welder at Tread,[7] he presents no medical evidence to support his contention that he could in fact perform the essential

---

[6] It is worth noting that Beckner himself recognized the risk of serious consequences should he fall again. In his deposition, Beckner acknowledged that Dr. Feldenzer recommended surgical decompression, which Beckner opted not to undergo, as a preventative measure, because "something maybe seriously could happen if [Beckner] ever fell like that again." Beckner Dep., Dkt. # 18-1, at 27.

[7] Beckner testified that he believed he could meet the physical requirements of the Tread job because he performs what is, in his view, the same type of work at his current job with Metalsa, which he began shortly after Tread decided not to hire him. Beckner Dep., Dkt. # 18-1, at 96; Beckner Dep., Dkt. # 24-7, at 114-16. Indeed, he was determined to be "Medically Acceptable for Position(s) Under Consideration" for the Metalsa job by Dr. Castern one month after Dr.

13

functions of the job. See Wulff v. Sentara Healthcare, Inc., 513 F. App'x 267, 269 n.2 (4th Cir. 2013) ("Wulff's 'self-serving opinion [about her restrictions without] . . . objective corroboration' does not permit her to avoid summary judgment." (quoting Williams v. Giant Food Inc., 370 F.3d 423, 433 (4th Cir. 2004))). Indeed, the only medical evidence in the record comes from Dr. Feldenzer and Dr. Castern. Dr. Feldenzer released Beckner to work as a welder without restrictions but did so with two admonitions: "be careful with his neck and [ ] avoid extended extension positions and any chance of falling." Ex. F. to Def.'s Summ. J. Br., Dkt. # 42, at RN0009. Based on this evidence and the specific requirements off the job at issue, Dr. Castern determined Beckner to be "Medically Acceptable with Job Assignment Limitations," specifically noting that Beckner must avoid looking upward and fall hazards. Castern Dep., Dkt. # 29, at VOM14; see also Ex. 20 to Bright Dep., Dkt. # 18-6. Beckner offers no medical evidence to the contrary.

Nor does Beckner present evidence to contradict what Tread has asserted are the essential functions of the job, set forth in the declarations of Kenneth White and David Harrison and the deposition testimony of Brian Kish. Beckner concedes that his best evidence is the April 1st email exchange, which he claims raises a question of fact as to the legitimacy of Tread's "concerns" about Beckner's ability to perform the essential function of the welder job. Relying on Phillips v. StellarOne Bank, No. 7:11cv440, 2010 WL 3762448 (W.D. Va. July 16, 2012), Beckner argues this single email is enough to get him past summary judgment.

---

Castern examined him in connection with his Tread application and assessed the "Job Assignment Limitations" giving rise to the instant lawsuit. Castern Dep., Dkt. # 29, at VOM10. Dr. Castern testified that when he examined Beckner in connection with the Metalsa job, he did not have a recollection of his examination of Beckner a month prior in connection with the Tread application. Interestingly, on the medical history form Beckner filled out when he was seeking employment with Metalsa, he failed to list the medication gabapentin (Neurontin) he listed previously when applying with Tread that prompted Dr. Castern to seek records from Dr. Feldenzer about Beckner's neurological condition. Compare Castern Dep., Dkt. # 29, at VOM10 and VOM13 with id. at VOM14 and VOM17.

With respect to his ability to work at Tread, Beckner also argues that the job description for the "Welder-Fabricator" position says nothing about looking up or standing on ladders. Beckner Dep., Dkt. # 24-7, at 116-17. But this description, found at Dkt. # 24-6, was created by Tread in 2012, after Beckner applied for the position at issue in this case. See Pl.'s Br., Dkt. # 24, at 20.

14

In Phillips, a case brought pursuant to the Age Discrimination in Employment Act and the Family Medical Leave Act, defendant StellarOne "sought to undermine Phillips' prima facie case by marshalling evidence of Phillips' failure to meet StellarOne's legitimate job expectations." Id. at *4. Phillips, however, argued that "StellarOne saddled him with impossible, illegitimate expectations that no employee could meet," pointing to two emails from StellarOne's head of human resources. Id. One of those emails stated with respect to a warning given to Phillips, "[t]here is *a lot of room for him to 'trip up'* after this warning considering all of the areas where he is below expectation and the magnitude of improvements needed." Id. at *2 (emphasis added). The second email stated, "Larry was to have provided the performance review to HR *so that we can scrub it to ensure it is appropriate* since this will be highly sensitive and this document could end up being used in a file defending our actions." Id. at *3 (emphasis added). The Phillips court held:

> These e-mails, standing alone, are sufficient to raise a triable question of fact regarding the legitimacy of StellarOne's expectations and, by extension, Phillips' prima facie case. The very same evidence calls into question StellarOne's nondiscriminatory explanation for Phillips' termination. The fact-finder is free to use the evidence as a basis for rejecting StellarOne's proffered explanation, and may then couple that rejection with the elements of the prima facie case to infer the ultimate fact of age discrimination.

Id. at *4.

Unlike in Phillips, the lone email exchange on which Beckner hangs his hat in this case does not create a triable question of fact. Beckner contends these emails prove invalid Dr. Castern's concerns about Beckner's ability to perform the job. But they do not. The email from Brian Kish states that overhead work is *limited* and that fall hazards are *minimized*, not that they are nonexistent. Kenneth White plainly expressed concern with Beckner's "future exposure / risk to injuries" even in

15

light of this characterization of the job. Pl.'s Br., Dkt. # 24, at Ex. E. No fact finder could interpret this email to mean that there was no legitimate business need for Beckner to work overhead.[8]

Aside from the April 1st emails and Beckner's own assertions, there is no evidence to establish that Beckner can perform the essential functions of the job in question. On this record, no reasonable fact finder could determine that Beckner has met his burden of proving a prima facie case of discrimination.

V.

"The ADA is designed to ferret out those situations in which an employer is deliberately acting in a discriminatory manner, and those in which an employer is merely attempting to create a safe work environment." Webb v. Medical Facilities of Am., No. 7:05CV00409, 2005 WL 3547034, at *3 (W.D. Va. Dec. 28, 2005) (citing 42 U.S.C. § 12113(a)-(b)). This case falls into the latter category.

Pursuant to its hiring protocol, Tread referred Beckner to Bright Services, where he applied for employment and was referred for a physical examination. That physical examination resulted in two "Job Assignment Limitations," Castern Dep., Dkt. # 29, at VOM14, concerning Beckner's ability to perform work involving prolonged neck extension or a risk of falling. These limitations were borne from the medical records of Beckner's treating neurosurgeon, Dr. Feldenzer. Tread was entirely within its right to rely on this objective medical evidence in concluding that Beckner could not perform the essential functions of the welder job. Indeed, "courts have [ ] endorsed the notion

---

[8] Further distinguishing this case from Phillips is the fact that nothing in the April 1st email exchange suggests a discriminatory animus. There is not a shred of evidence of pretext in this case. Citing an unpublished decision from the Fourth Circuit, Calef v. FedEx Ground Packaging System, Inc., No. 08-2031, 2009 WL 2632147 (4th Cir. Aug. 27, 2009), Beckner argues that he need not prove pretext to survive summary judgment. Calef, a case brought under the West Virginia Human Rights Act (WVHRA), cited a West Virginia state court case Stone v. St. Joseph's Hospital of Parkersburg, 208 W. Va. 91, 538 S.E.2d 389, 404 (2000), for the proposition that "discriminatory animus is not an essential element of a WVHRA 'regarded as' disability claim." See id. at *12. Relying on Calef, Beckner contends that pretext is likewise not an essential element of his ADA case. As the court in Calef noted, however, the WVHRA often corresponds with, but sometimes strays from, the ADA. Id. at *5. In any event, the court need not decide the issue of pretext here, as Beckner has failed to state a prima facie case of discrimination for the reasons set forth supra.

16

that an employer may rely on the restrictions imposed by an employee's physician." E.E.O.C. v. Greystar Mgmt Servs., L.P., No. ELH-11-2789, 2013 WL 6731885, at *23 (D. Md. Dec. 18, 2013) (cataloging cases); see also Wulff v. Sentara Healthcare, Inc., 513 F. App'x 267, 269 n.2, 271-72 (4th Cir. 2013). Tread reached its conclusion that Beckner could not perform the essential elements of the welder job after careful consideration and input from Tread's Human Resources Director, a shift supervisor, the Vice President of Manufacturing, and the CEO in discussions that continued outside of the April 1st email exchange upon which Beckner relies. There is simply no indication that Tread acted based on anything other than concern for Beckner's personal safety and the safety of those who would be working with him.

For these reasons, Tread's motion for summary judgment will be **GRANTED**.

An appropriate Order will be entered.

Entered: December 8, 2014

*Michael F. Urbanski*

Michael F. Urbanski
United States District Judge